UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


GARY DALE MOORE


                              CIVIL ACTION NO. 2:10-0926
v.                            (Criminal No. 2:07-00023)


UNITED STATES OF AMERICA



MEMORANDUM OPINION AND ORDER


        Pending is movant's motion to vacate, set aside, or
correct his sentence filed July 19, 2010.  This action was
previously referred to the Honorable Mary E. Stanley, United
States Magistrate Judge, for submission to the court of her
Proposed Findings and Recommendation ("PF&R") for disposition
pursuant to 28 U.S.C. § 636.  On September 13, 2011, the court
received the PF&R.  Following the granting of extensions of time,
movant's objections were timely received on December 8, 2011.

I.


On January 30, 2007, the United States filed a two-count indictment ("federal indictment") against movant.  Count One charged his possession of a firearm and ammunition after having been convicted of certain felony offenses, in violation of 18 U.S.C. § 922(g)(1).  The indictment lists the prior convictions as follows:

> a. Convicted on or about March 16, 1987 in the Circuit Court of Portage County, Ohio of two counts of aggravated burglary of a dwelling in violation of Section 2911.11 of the Ohio Revised Code; and

> b. Convicted on or about March 15, 1995 in the Circuit Court of Lincoln County, West Virginia of "jail breaking" in violation of Section 61-5-10 of the West Virginia Code [("jailbreaking/escape conviction")].

(Indict. at 1).  Count Two charged movant with forcibly resisting, opposing, impeding, and interfering with a federal law enforcement officer in violation of 18 U.S.C. § 111 (a)(1).


The jailbreaking/escape conviction arose out of movant jumping to freedom from a window in the Lincoln County Sheriff's Office, located within the Lincoln County Courthouse, while handcuffed.  Once free of his custodial setting, he ran across a football field, swam through a river, and continued his trek through the woods after reaching the opposite bank.  He was

absent three days, at which time he was apparently recaptured by law enforcement.  It is not clear from the official documents if the escape occurred while movant was inside the jail proper or, instead, at some other location in the courthouse area awaiting an appearance respecting other charges then pending against him.

Movant's account of the event, set forth in his objections, essentially tracks the description found in the PF&R but adds some further detail:

> Movant was not in any jail, cell or any other place of confinement at the time of his . . . jailbreak/escape offense.  Movant was at the Lincoln County Courthouse sitting in a jury deliberation room waiting to appear in court, left in room unguarded with hallway door shut, movant got up and walked over to window and pushed open an unlocked window, jumped out to ground and walked away from courthouse in center of the town of Hamlin, West Virginia, middle of the day, having no contact or confrontation of any kind with anyone, re-arrested peacefully and easily three day's later while caught sleeping in a bed at relative's house . . . . Movant only stated all he done in plea colloquy, movant only stated the truth of the whole matter . . . .

(Objecs. at 13-14).

On October 25, 2007, the presiding judge received movant's guilty plea to that portion of Count One of the federal indictment alleging his unlawful possession of ammunition.  The plea agreement cautioned that if movant was found "to qualif[y] as an armed career criminal pursuant to 18 U.S.C. § 924(e) [("Armed Career Criminal Act" or "ACCA")], the maximum statutory

3

penalty" would be at least 15 years imprisonment.  (Plea agmt. at 3).

On February 22, 2008, the Judgment was entered sentencing movant to, <u>inter alia</u>, 180 months imprisonment.  The sentence was based upon a finding that the three predicate state convictions alleged in the federal indictment constituted three violent felonies under the ACCA.

The term is defined by section 924(e)(2)(B), which provides materially as follows:

> [T]he term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that --
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, <u>or otherwise involves conduct that presents a serious potential risk of physical injury to another</u> . . . .

<u>Id.</u>  (emphasis added).  The underscored portion is central to the analysis that will follow.  It is referred to herein as the "ACCA residual clause."

4

On February 25, 2008, movant noticed an appeal.  As observed by the magistrate judge, on April 16, 2008, the Supreme Court handed down its decision in Begay v. United States, 553 U.S. 137 (2008).  The Begay decision concluded that a New Mexico felony offense of driving under the influence of alcohol ("DUI") did not qualify as an ACCA violent felony.  The Supreme Court noted that while the DUI crime involved conduct that presented a serious potential risk of physical injury to another, the statute did not contemplate inclusion of the offense for ACCA predicate purposes:

> In our view, the provision's listed examples -- burglary, arson, extortion, or crimes involving the use of explosives -- illustrate the kinds of crimes that fall within the statute's scope. Their presence indicates that the statute covers only similar crimes, rather than every crime that "presents a serious potential risk of physical injury to another."
>
>        . . . .
>
> [T]he examples in clause (ii) limit the scope of the clause to crimes that are similar to the examples themselves.

Begay, 553 U.S. at 142, 143.

During his direct appeal in this action, movant contested the finding that he qualified as an armed career criminal.  His lawyer, however, did not rely upon, or even mention, the Begay decision.  She asserted only that the two Ohio

5

convictions should not count inasmuch as movant was a juvenile at the time of their commission and his crimes did not involve the use or carrying of a firearm, knife, or destructive device.

On January 26, 2009, the court of appeals affirmed. The appellate decision noted that movant qualified for the ACCA-enhanced sentence based upon the two Ohio aggravated burglary charges and the West Virginia jailbreaking/escape conviction. See United States v. Moore, No. 08-4279, slip op. at 4 (4th Cir. Jan. 26, 2009) ("This court has found that if the defendant was prosecuted as an adult, it is irrelevant that the defendant was a juvenile at the time of the offense for the purposes of § 924(e), as long as the offense is punishable by more than one year imprisonment."). The Begay decision was noted in the movant's August 3, 2009, petition for a writ of certiorari, which was denied.

Following receipt of movant's instant section 2255 motion, the magistrate judge, on June 1, 2011, directed the United States to expand the record "with any procurable Shepard-approved documents, including a transcript of the movant's plea colloquy from his jailbreaking/ escape conviction." (U.S. Resp.

at 1).[1]  The state indictment reflects that the jailbreaking/
escape conviction occurred in December 1993, at a time when West
Virginia Code section 61-5-10(b) read as follows:

> If any person be lawfully confined in jail . . . and
> not sentenced on conviction of a criminal offense,
> shall escape therefrom by any means, such person shall,
> (i) if he be confined upon a charge of a felony, be
> guilty of an additional felony, and, upon conviction
> thereof, shall be confined in the penitentiary not less
> than one nor more than five years . . . .

W. Va. Code § 61-5-10(b) (1993).  While there is little guidance

---

[1]The case to which the magistrate judge referred is Shepard
v. United States, 544 U.S. 13 (2005).  It is uncertain whether
the Shepherd-approved documents submitted to the magistrate judge
were part of the record during movant's direct appeal.  The court
is aware of the recent en banc decision of our court of appeals
in United States v. Vann, 660 F.3d 771 (4th Cir. 2011), in which
it is stated as follows respecting the direct appeal there under
review:

> It is one thing for a federal court to look at a state
> court docket in asserting jurisdiction over a removed
> case, or to note a subsequent arson conviction in
> determining the propriety of rescinding a fire
> insurance settlement offer. It is materially different
> to rest a sentencing decision -— transforming a
> ten-year maximum into a fifteen-year minimum -— on the
> basis of evidence never presented to the district
> court, particularly when such evidence was not
> requested until after oral argument [before the
> appellate court].

Id. at 775-76 (citation omitted).
        The recently submitted Shepard materials in this action
raise no concerns under Vann.  Irrespective of the availability
of those materials at movant's sentencing, they are essential in
now ascertaining, by way of the modified categorical approach,
whether movant has satisfied the prejudice prong governing his
claim for ineffective assistance of appellate counsel.  The
matter is discussed more fully infra.

from the Supreme Court of Appeals of West Virginia respecting the elements for a section 61-5-10(b) offense, they are easily divined from the statutory text.  In sum, there are two elements, namely, (1) an escape from custody, (2) performed by one who is a lawfully confined pre-disposition detainee.

As observed by the magistrate judge, movant's section 2255 motion asserts two grounds for relief.  First, he claims ineffective assistance of counsel arising out of his lawyer's failure to argue the Begay decision during the direct appeal.  Second, he asserts ineffective assistance respecting the lawyer's failure to raise Amendment 709 of the United States Sentencing Guidelines to avoid the armed career criminal enhancement.  The magistrate judge deemed the Amendment 709 ground to lack merit, a conclusion that is plainly correct for the reasons expressed by her in the PF&R.  In sum, Amendment 709 would have no impact on the movant's sentence inasmuch as the sentence was imposed pursuant to the ACCA.  Amendment 709 did not alter the statutory definition of the term "armed career criminal."  Amendment 709 thus had no effect on movant's sentence.  His counsel was not ineffective for failing to raise this meritless issue.

The magistrate judge additionally concluded that movant's lawyer's failure on direct appeal to raise the Begay

8

decision did not constitute ineffective assistance of appellate
counsel.  In a filing received December 8, 2011, movant objected.
While the magistrate judge has thoroughly, and correctly, recited
the posture of the case and the governing law, the matter
warrants careful scrutiny on review given recent developments
respecting the ACCA residual clause.


II.


A.   Circuit Precedent at the Time of, and Following, <u>Begay</u>


        At the time movant's case was pending on direct appeal,
the law in our circuit was well settled respecting the interplay
of state escape offenses and the Armed Career Criminal Act.  The
law at that time consisted of <u>United States v. Hairston</u>, 71 F.3d
115 (4th Cir. 1995).  In <u>Hairston</u>, the question was whether a
felony escape conviction was captured by the ACCA residual
clause.

        The court cast the inquiry as requiring a "'common-
sense judgment[] about whether a given offense proscribes generic
conduct with the potential for serious physical injury to
another.'"  <u>Id.</u> at 117 (quoting <u>United States v. Custis</u>, 988 F.2d

9

1355, 1363 (4th Cir. 1993)).  Using that standard, the court of appeals concluded that the felony escape offense fell within the ACCA residual clause:

> Critical to our conclusion is the chance that in the case of an escape by stealth, the escapee will be intentionally or unintentionally interrupted by another, for example a prison guard, police officer or ordinary citizen. This encounter inherently presents the serious potential risk of physical injury to another, because the escapee, intent on his goal of escaping, faces the decision of whether to dispel the interference or yield to it. To avoid jeopardizing the success of the escape and further punishment upon capture, the escapee may choose to dispel the interference by means of physical force.

Hairston, 71 F.3d at 118.

Following the decision in Begay, but just thirteen days prior to the affirmance of movant's conviction, the Supreme Court decided Chambers v. United States, 555 U.S. 122 (2009).  At issue in Chambers was whether the failure to report for imprisonment qualified as an ACCA violent felony.  The Supreme Court made an observation that seems to diminish the force attributed to Begay by movant herein:

> The behavior that likely underlies a failure to report would seem less likely to involve a risk of physical harm than the less passive, more aggressive behavior underlying an escape from custody.

Id. at 127.

On April 27, 2010, well over a year following the
decision respecting movant's direct appeal, the court of appeals
decided <u>United States v. Bethea</u>, 603 F.3d 254 (4th Cir. 2010).[2]
The panel in <u>Bethea</u> observed that <u>Chambers</u> "directly undermines
our holding in <u>Hairston</u>, particularly where an escape statute can
be violated by a defendant's failure to report to custody."  <u>Id.</u>
at 257.  The decision in <u>Bethea</u>, however, seems to support the
conclusion in <u>Hairston</u> that traditional escapes, as distinguished
from failure to report, qualify as ACCA violent felonies.

At one point in the <u>Bethea</u> decision, it is observed
that "the South Carolina escape statute here penalizes both
unlawfully leaving custody <u>and</u> failing to report to custody."
<u>Id.</u> at 259 (emphasis added).  Just two sentence later, the
decision observes that "South Carolina's escape statute includes,
by definition, at least one form of conduct <u>that is</u> and one form
of conduct <u>that is not</u> an ACCA predicate . . . ."  <u>Id.</u> (emphasis
added).  This suggests the continuing view in our circuit
following <u>Bethea</u> that unlawfully leaving custody, <u>i.e.</u>, a
traditional escape, such as that apparently performed here by
movant, continues to qualify as a violent felony under the ACCA.

_____

[2]The court is aware that the proper time frame governing a
claim of ineffective assistance of appellate counsel essentially
looks to the state of the law at the time of the appeal.  In this
case, ACCA developments coming after that date are helpful in
ascertaining whether movant was prejudiced by his lawyer's
failure to raise <u>Begay</u>.

Another decision in this area, <u>United States v. Clay</u>, 627 F.3d 959 (4th Cir. 2010), came roughly eight months after <u>Bethea</u>.  It further refined the ACCA implications for those who have previously disobeyed or violated the terms of a custodial sentence.  In <u>Clay</u>, the district court counted against the defendant a prior conviction for felony escape.  The offense was consequently treated as a crime of violence under the United States Sentencing Guidelines.[3]  The escape in question, however, consisted of a "walk away" from a nonsecure facility.[4]  The state statute under which defendant was convicted criminalized not only traditional escapes but also (1) the failure to return to custody as instructed, and (2) the type of walkaway perpetrated by Clay.

Addressing an issue of first impression in our circuit, it was determined in <u>Clay</u> that "a walk-away escape from an unsecured facility is a far cry from the type of conduct associated with the enumerated crimes in § 4B1.2(a)'s Otherwise Clause" and hence the ACCA residual clause.  <u>Id.</u> at 969.

_____

[3]The magistrate judge correctly observes the interplay between the Guidelines and the ACCA in this area.  In sum, the ACCA defines the term "violent felony" in a manner substantively identical to the definition of a crime of violence in Guidelines section 4B1.2.

[4]The decision makes mention as well of the fact that defendant also pled guilty to the offense of interference with government property involving damage he inflicted to his leg irons.  The offense conduct was committed on the same day that defendant engaged in his felony escape offense.

12

The court of appeals in <u>Clay</u> noted that five sister circuits had reached the same conclusion with similar analyses:

> Common to each of these decisions is the rationale that a walk-away escape from an unsecured facility, in the words of the Eleventh Circuit . . ., quoting in part the words of the Sixth Circuit . . . , "[u]nlike the prototypical escape scenario in which an individual must overcome physical barriers, a walkaway escape involves simply 'leav[ing] a facility without removing a physical restraint, without breaking a lock on a door, without climbing over a prison wall or security fence or without otherwise breaking through any other form of security designed to keep them put.'" Moreover, "an individual who simply walks away from custody was just as unlikely as an individual who fails to report to custody to call attention to his whereabouts by simultaneously engaging in additional violent and unlawful conduct."

<u>Id.</u> at 969 (citations omitted).

Another very recent development warrants mention as well.  Earlier this year, the Supreme Court decided <u>Sykes v. United States</u>, 131 S. Ct. 2267 (2011).  In <u>Sykes</u>, the issue was whether a violent felony resulted from a driver who knowingly or intentionally fled from law enforcement.  That portion of the decision in <u>Sykes</u> that compares the fleeing offense to burglary, a predicate violent crime specifically mentioned in the ACCA, is instructive here:

> Burglary is dangerous because <u>it can end in confrontation leading to violence</u>.  The same is true of vehicle flight, but to an even greater degree. <u>The attempt to elude capture is a direct challenge to an officer's authority. It is a provocative and dangerous</u>

> <u>act that dares, and in a typical case requires, the</u>
> <u>officer to give chase</u>. The felon's conduct gives the
> officer reason to believe that the defendant has
> something more serious than a traffic violation to
> hide.
>
>     . . . .
>
> And once the pursued vehicle is stopped, it is
> sometimes necessary for officers to approach with guns
> drawn to effect arrest. Confrontation with police is
> the expected result of vehicle flight. It places
> property and persons at serious risk of injury.
>
> Flight from a law enforcement officer invites, even
> demands, pursuit. As that pursuit continues, the risk
> of an accident accumulates.  And having chosen to flee,
> and thereby commit a crime, the perpetrator has all the
> more reason to seek to avoid capture.

<u>Sykes</u>, 131 S.Ct. at 2273-74 (emphasis added).  Many of the same

observations might be made respecting the non-vehicle flight from

law enforcement perpetrated by movant.

        Noteworthy as well is another portion of the opinion in

<u>Sykes</u>, which clarifies at least two matters.  First, it

elaborates upon, and narrows, certain material language in <u>Begay</u>.

Second, it contrasts the DUI crime at issue in <u>Begay</u> with that

committed by Sykes:

> <u>Begay</u> involved a crime akin to strict liability,
> negligence, and recklessness crimes; and the
> purposeful, violent, and aggressive formulation was
> used in that case to explain the result.  The felony at
> issue here is not a strict liability, negligence, or
> recklessness crime and because it is, for the reasons
> stated and as a categorical matter, similar in risk to

14

the listed crimes, it is a crime that "otherwise
involves conduct that presents a serious potential risk
of physical injury to another." § 924(e)(2)(B)(ii).

<u>Sykes</u>, 131 S. Ct. at 2276.


B.    The Governing Standard and Analysis of Movant's Ineffective
      Assistance Claim


        In view of the evolving nature of the governing

substantive law discussed <u>supra</u>, it is essential to bear in mind

the standard governing movant's ineffective assistance of counsel

claim, the roots of which are found in <u>Strickland v. Washington</u>,

466 U.S. 668, 687 (1984).  The standard governing ineffective

appellate assistance claims is set forth in <u>Smith v. Robbins</u>, 528

U.S. 259 (2000).  As is apparent from the quoted language below,

the circumstances in <u>Smith</u> were slightly different from those

presented here.  The prejudice prong of the standard, however, is

identical irrespective of that difference:

> Respondent must first show that his counsel was
> objectively unreasonable . . . in failing to find
> arguable issues to appeal -- that is, that counsel
> unreasonably failed to discover nonfrivolous issues and
> to file a merits brief raising them. If . . . [he]
> succeeds in such a showing, <u>he then has the burden of
> demonstrating prejudice</u>.  That is, he must show a
> <u>reasonable probability that, but for his counsel's
> unreasonable failure to file a merits brief, he would
> have prevailed on his appeal</u>.

<u>Smith</u>, 528 U.S. at 285 (emphasis added) (citations omitted)

(noting that the prejudice prong is the same whether the claim is

the failure to find arguable issues or the failure to raise a
particular claim); <u>Bell v. Jarvis</u>, 236 F.3d 149, 164 (4th Cir.
2000) ("'Generally, only when ignored issues are clearly stronger
than those presented, will the presumption of effective
assistance of counsel be overcome.'") (quoting <u>Smith</u>, 528 U.S. at
288 (quoting <u>Gray v. Greer</u>, 800 F.2d 644, 646 (7th Cir. 1986)).

One could speculate that a panel of our court of
appeals might have deemed <u>Hairston</u> to yield to <u>Begay</u> had the
issue been presented by movant's lawyer during the direct appeal.
Just as prognostication is not prejudice, possibilities are not
reasonable probabilities.  While the law appears to be on the
move in this area, movant's view of the law has not yet
materialized, even if, at the time of the escape, he found
himself elsewhere within the courthouse area instead of the jail
proper.  That point is well illustrated by a recently developed
split in the courts of appeal.

In late December 2011, the United States Court of
Appeals for the Tenth Circuit concluded as follows:

> [I]t is clear, "conceptually speaking," that the form
> of escape that Koufos was charged with committing,
> <u>i.e.</u>, escaping or leaving law enforcement custody,
> requires affirmative action (in contrast to the crime
> of failure to report), and likely poses a serious
> potential risk of physical injury not only to the law
> enforcement officers, but also to the public at large.

16

> Notably, the statistics contained in . . . [a]
> Sentencing Commission report cited in [the Supreme
> Court's decision in] <u>Chambers</u> confirm these
> assumptions.  Of the thirteen cases where a defendant
> left law enforcement custody, two (or 15.4%) resulted
> in injury.  This injury percentage (15.4%) was the
> highest of the five categories of escape catalogued in
> the report (even higher than the injury percentage for
> escapes from secure custody, such as jail or prison).

<u>United States v. Koufos</u>, No. 10-2195, --- F.3d ----, 2011 WL
6778133, at *11 (10th Cir. Dec. 27, 2011) (case involving
individual who escaped from custody at the United States District
Courthouse in New York while awaiting arraignment) (footnote
omitted).  Just days prior, the United States Court of Appeals
for the Sixth Circuit appears to have taken a contrary approach,
albeit with one panel member in dissent.  <u>United States v. Oaks</u>,
No. 06-6056, --- F.3d ---, ---, 2011 WL 6224551, at *1 (6th Cir.
Dec. 15, 2011) (involving a courthouse escape by an accused
waiting to enter a plea and a panel majority concluding that the
courtroom from which Oaks escaped was not secure and that escape
from nonsecure custody is not a violent felony for Armed Career
Criminal Act purposes).

    In sum, a traditional escape, the category into which
movant's offense most comfortably fits, remains an ACCA predicate
in this circuit.  To the extent distinctions might be drawn
between a jailbreak from within prison walls or that of a

17

handcuffed pretrial detainee jumping from a window in a room in the vicinity of a courtroom where the accused is scheduled to appear, the jurisprudence has not caught up with movant's legal position.

The decision in Clay changes nothing in that regard for at least three reasons.  First, and most obviously, movant's direct appeal was decided long before that decision and neither Begay (DUI) nor Chambers (failure to report) necessarily forecast the result reached in Clay (walk away from an unsecured facility).  Second, Clay did not involve a traditional escape, which, again, is more akin to the conduct engaged in by movant. Third, the question is not whether movant's interpretation of Begay and its progeny is correct.  It is whether his lawyer's failure to raise Begay on direct appeal resulted in prejudice to him as contemplated by Strickland, Smith, and Bell.

Having considered the aforementioned authorities, along with the magistrate judge's comprehensive recital, and without reaching the question of whether movant's counsel was deficient, there is lacking any reasonable probability that, but for any unreasonable mistake by counsel, movant would have prevailed on his direct appeal.

18

C.   The Alleged Nonreceipt by Movant of Certain Filings

        Finally, movant asserts that he never received the
August 3, 2011, supplemental response by the United States
("supplemental response") nor its August 8, 2011, response that
attached the Shepard documents ("Shepard response") requested by
the magistrate judge.  That assertion requires some explanation.

        On or about August 27, 2010, movant was incarcerated at
United States Penitentiary ("USP") McCreary.  On September 17,
2010, he advised both the Clerk, and apparently the United
States, that he had been transferred to Federal Correctional
Institution Gilmer, where he presently resides.  The United
States nevertheless appears to have continued serving its filings
upon movant at his prior place of incarceration, USP McCreary.

        Despite this misdirection, movant appears to have
continued receiving the United States' filings.  For example, on
November 12, 2010, the United States responded to movant's
section 2255 motion, sending the document to movant at USP
McCreary.  On December 3, 2010, movant sought an extension of
time to reply to the document, later filing that reply on January
27, 2011.  It thus appears the United States' November 12, 2010,
response was properly forwarded to movant despite the United
States use of his former address.

19

Movant was also properly advised by the court that the United States intended to make further filings after his January 27, 2011, reply was received.  On June 1, 2011, the magistrate judge directed the United States to expand the record with the Shepard documents, including the transcript of movant's state plea colloquy, that he now complains was never received.  The magistrate judge's order was apparently sent to FCI Gilmer, as were all documents transmitted by the court around the time of movant's transfer to that facility and thereafter.

The magistrate judge entered another order on July 18, 2011, which movant would also have received, granting an extension to the United States until September 5, 2011, to file the Shepard materials that included the aforementioned transcript.  As noted, the United States filed the supplemental response and the Shepard response on August 3 and August 8, 2011, respectively.

It appears that movant expected the further filings by the United States that were ordered by the magistrate judge. On September 18, 2011, he requested a docket sheet from the Clerk. The Clerk promptly responded to the request two days later, sending a docket sheet which clearly reflects the earlier filing of the supplemental response and the Shepard response.  Movant

did not complain that he was not served with the two documents. He might have done so in his September 21, October 21, or November 25, 2011, requests for extensions of time to respond to the PF&R.  Those three extensions, collectively, provided him an extension for objections of over 90 additional days beyond that prescribed by law.

In any event, assuming movant did not receive the supplemental response and <u>Shepard</u> response, he does not suggest precisely how he has been prejudiced as a result.  As set forth earlier in this memorandum opinion, the court has taken note of movant's description of the underlying offense conduct that resulted in the jailbreaking/escape conviction.  He has also fully aired his views respecting the PF&R in the 68 pages of objections he has filed, all of which have been carefully scrutinized by the court.  The court, accordingly, discerns no merit in movant's assertion.

Having considered the entirety of the record <u>de novo</u>, and having found the objections meritless, the court adopts and incorporates herein the magistrate judge's PF&R.  The court, accordingly, ORDERS that this action be, and it hereby is, dismissed.

The Clerk is directed to forward copies of this written opinion and order to the United States Magistrate Judge, movant, and all counsel of record.

DATED:  February 17, 2012

John T. Copenhaver, Jr.
United States District Judge